UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAVONNE A. HARRIS,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>    Defendant. | Case No.: 1:15-cv-01429 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF LAVONNE HARRIS AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Lavonne Harris asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ failed to identify legally sufficient reasons for rejecting the opinion of Plaintiff's treating physicians, the decision is **REMANDED** for further proceedings.

**PROCEDURAL HISTORY**

Plaintiff filed her application for benefits on December 22, 2011, alleging disability beginning on December 7, 2007. (Doc. 7-3 at 19) The Social Security Administration denied Plaintiff's application at both the initial level and upon reconsideration. (*See generally* Doc. 7-4) After

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, as the defendant.

1

requesting a hearing, Plaintiff testified before an ALJ on November 5, 2013. (Doc. 7-3 at 19, 35) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on January 15, 2014. (*Id.* at 19-27) When the Appeals Council denied Plaintiff's request for review of the decision on July 21, 2015 (*id.* at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.    Relevant Medical Evidence**

Plaintiff was treated at Adventist Health Community Care Clinic ("Adventist Clinic") throughout the period relevant to her claim. Plaintiff "was diagnosed with a seizure disorder in 2007." (Doc. 7-10 at 37)

On June 13, 2011, Plaintiff went to the emergency department at Adventist Medical Center, reporting that she felt "real dizzy and lightheaded," and "fell in her boyfriend's arms" the night before, "and may have passed out." (Doc. 7-10 at 37) Plaintiff's musculoskeletal exam showed she had a normal range of motion and strength, and no tenderness. (*Id.*) In addition, her neurological results were "normal." (*Id.*) However, Plaintiff had "a low hemoglobin … and an elevated platelet count." (*Id.* at 40) As a result, Plaintiff "receive[d] three units of blood transfusion," and the doctor ordered iron studies. (*Id.*) She was diagnosed with "[s]evere microcytic anemia." (*Id.* at 41) Plaintiff was discharged from the hospital on June 15. (Doc. 7-8 at 24)

Two days later on June 17, Plaintiff returned to the emergency department, reporting she had chest pain, which she described as "8/10;" as well as shortness of breath; and nausea. (Doc. 7-8 at 25) She reported also that she had "body pain for 2 weeks, esp[ecially] below the waist," which she described as "6/10." (*Id.* at 24-25) Dr. Athale determined Plaintiff's chest x-ray and pelvic ultrasound

results were normal. (*Id.* at 28-30) Plaintiff received a prescription for Norco with educational materials on pain and was discharged the same date. (*Id.* at 31)

On June 27, 2011, Plaintiff told Dr. Frank Gavini that she "had a syncopal episode while walking to a store to get water," and the episode lasted "less than 10 seconds." (*Id.* at 14, emphasis omitted) She denied having any shortness of breath, headache, weakness, or dizziness. (*Id.* at 14) Dr. Gavini found Plaintiff had a normal neurological and musculoskeletal exam, including normal sensory function, coordination, gait, and motor strength. (*Id.* at 17) Dr. Gavini diagnosed Plaintiff with "[s]yncope and collapse," and ordered an echocardiogram, which showed "mild mitral and tricuspid insufficiency." (*Id.*; Doc. 7-10 at 6)

On July 5, 2011, Plaintiff had a follow-up at Adventist Clinic after visiting an emergency room for "episodes of fainting [and] not remembering where she is when she wake[s] up." (Doc. 7-8 at 4) Plaintiff reported she had pain in her head, which she described as a "7" out of 10, as well as continuing pain in her knee. (*Id.*) Her physical examination was "unremarkable." (*Id.*)

On July 12, 2011, Plaintiff underwent an MRI study of her brain, which Dr. Bryson Borg found showed a Chiari malformation. (Doc. 7-8 at 5-6) Dr. Borg found no evidence of hydrocephalus. (*Id.* at 6) She returned to the clinic a week later to visit Dr. Glossbrenner, reporting she was "having episodes of fainting [and] not remembering where she has been when she wake[s] up." (*Id.* at 60)

Plaintiff had another x-ray of her chest taken on July 17, 2011, after returning to the emergency department with continued reports of chest pain. (Doc. 7-10 at 53-54) Plaintiff reported that her pain was "7/10," and the pain appeared "triggered by emotional stress." (*Id.* at 58) Dr. Jennifer Cranny determined Plaintiff had "[m]ild enlargement of the heart with vascular congestion." (*Id.* at 53)

On August 24, 2011, Plaintiff told Dr. Rohini Joshi, a neurologist, that she had two seizures since her last visit at the Adventist Clinic in June, and she had stopped taking Keppra. (Doc. 7-8 at 19) Dr. Joshi noted they needed to determine whether Plaintiff had "syncope vs seizures." (*Id.*) He also indicated Plaintiff's neurological examination was not within normal limits. (*Id.*) On August 31, Plaintiff again visited the Adventist Clinic, reporting she "had two seizures in the past week." (*Id.* at 50) Dr. Glossbrenner found Plaintiff had grating, and crepitus in her knees, as well as pain with

flexion. (*Id.*) Dr. Glossbrenner then referred Plaintiff to an orthopedist. (*Id.*)

In September 2011, Plaintiff visited the emergency department, describing "body aches and multiple musculoskeletal pains," which had been ongoing for a week. (Doc. 7-10 at 47) Plaintiff said the pain was exacerbated with "movement, exertion, [and] transfer." (*Id.*) She showed "difficulty" bearing weight on her right leg. (*Id.* at 48) Upon examination, Plaintiff had a normal strength and range of motion. (*Id.*) Plaintiff was diagnosed with myalgias and arthritis. (*Id.* at 49)

In October 2011, Plaintiff visited Dr. Joshi, reporting she "had a seizure in the last week." (Doc. 7-8 at 47) She was not taking Keppra, and discontinued Topomax. (*Id.*) Plaintiff told Dr. Joshi that she did not have "new weakness" or "new numbness." (*Id.*)

On November 9, 2011, Plaintiff told Anitra Aytman, NP, at Adventist Clinic that she continued to have pain in her right knee, which she believed was worsening due to her weight. (Doc. 7-8 at 46) Ms. Aytman observed that Plaintiff's right knee was slightly swollen. (*Id.*) She opined Plaintiff did not have a normal neurological examination. (*Id.*)

Plaintiff continued to have pain in December 2011, though she had normal neurological results at that time. (Doc. 7-10 at 118)

On February 15, 2011, Plaintiff was treated by Ms. Aytman that she continued to have pain "all over," and that cold weather was making the symptoms worse. (Doc. 7-10 at 117) In addition, Plaintiff reported that her "seizures have increased." (*Id.*) Ms. Aytman opined Plaintiff did not have a "negative" neurological examination. (*Id.*) She again indicated Plaintiff had arthritis, and prescribed vicodin. (*Id.*)

Plaintiff called for emergency services on February 19, 2011. (Doc. 7-10 at 81) Upon arrival, a paramedic found Plaintiff "seated in no obvious distress," but she reported "weakness on the [right] side of her body." (*Id.*) After being transported to the emergency department, Plaintiff reported she had a headache, weakness, and fatigue. (*Id.* at 75) Dr. Eisner observed that Plaintiff's CT showed "no abnormalities," and her lab results were "okay except she [was] anemic." (*Id.* at 77) Dr. Eisner opined that Plaintiff's "arm heaviness/ weakness [was] part of her migraine syndrome." (*Id.*)

In November 2011, Plaintiff continued to report weakness in her right side, stating that her side was "going numb & staying numb & weak for hours." (Doc. 7-13 at 39) In addition, Plaintiff told Ms.

Aytman that she had blurred vision, lightheadedness, and "pain all over [her] body." (*Id.*)

Ms. Aytman completed a "Multiple Impairment Questionnaire" on February 20, 2012. (Doc. 7-10 at 105-112) She noted that Plaintiff had been diagnosed with hypertension, seizure disorder, and arthritis. (*Id.* at 105) According to Ms. Aytman, these diagnoses were supported by Plaintiff's memory lapses and "witness convulsion," an elevated sedentary blood pressure rate, and chronic pain. (*Id.*) She noted Plaintiff had "progressively wors[e] symptoms, fatigue & generalized pain… in all major joints," as well as "11 points on [her] back." (*Id.* at 107) Ms. Aytman indicated Plaintiff's pain ranged from "4" to "10" on the pain scale, and her fatigue ranged from "4" to "7" out of "10". (*Id.*) Ms. Aytman opined Plaintiff was able to sit, stand, or walk "0-1" hour in an eight-hour day, and noted Plaintiff must be able to get up and move around every thirty minutes to one hour. (*Id.*) Ms. Aytman believed Plaintiff could lift and carry 10-20 pounds occasionally and up to 10 pounds frequently. (*Id.* at 108) Further, she indicated that Plaintiff had moderate limitation with grasping, turning, and twisting objects; and minimal limitation with using her fingers/hands for fine manipulations. (*Id.* at 108-109) Ms. Aytman concluded Plaintiff's symptoms would "frequently" be severe enough to interfere with her attention and concentration. (*Id.* at 110)

On June 6, 2012, Plaintiff went to Adventist Clinic, reporting she had a seizure the day before. (Doc. 7-13 at 45) Dr. Joshi noted Plaintiff described weakness on her right side. (*Id.*) Upon the referral of Dr. Joshi, Plaintiff went to the emergency department for evaluation of a potential stroke. (Doc. 7-12 at 54, 57) Plaintiff explained she felt "off-balance and weak." (*Id.* at 57) The treatment notes indicate that Plaintiff was observed walking "with [an] altered gait." (*Id.*) Upon examination, Plaintiff's strength was "5/5" in all extremities, and she had a normal range of motion. (*Id.* at 59) Plaintiff was diagnosed with weakness, anemia, menorrrhagia, and obesity. (*Id.* at 60) She did not want a blood transfusion, and was discharged in stable condition. (*Id.*)

On August 8, 2012, Plaintiff told Ms. Aytman that her pain was a "6" out of 10 in her right knee. (Doc. 7-10 at 120) In addition, Plaintiff complained about "having hot flashes…[and] waking upon in a pool of sweat" two to three times a month. (*Id.*) Ms. Aytman observed that Plaintiff had crepitus in her right knee, but no swelling. (*Id.*) On August 21, Plaintiff went to the emergency room reporting weakness and a "new onset of dizziness." (Doc. 7-12 at 64) She was diagnosed with

dizziness with an unknown cause and iron deficiency, and directed to follow up with her primary care physician. (Doc. 7-13 at 2) During the follow-up visit with Dr. Joshi, Plaintiff informed Dr. Joshi that she had run out of her seizure medication. (Doc. 7-11 at 7) Plaintiff also reported that she had a headache, but no seizures, weaknesses, or numbness. (*Id.*)

Plaintiff had an MRI of her cervical spine on August 27, 2012. (Doc. 7-11 at 7-8) According to Dr. Hassankhani, Plaintiff had "mild foraminal narrowing" at the C4-5 level, "[m]ild canal and foraminal narrowing" at the C5-6 and C6-7 levels, and "tonsillar ectopia consistent with Chiari I malformation." (*Id.* at 8) Dr. Hassankhani opined Plaintiff's disc heights and apophyseal joints were normal. (*Id.*)

On September 7, 2012, Plaintiff told Dr. Abdulla that she was dizzy in the mornings, and continued to have leg and knee pain. (Doc. 7-10 at 121) Dr. Abdulla noted Plaintiff was taking iron for anemia, as well as Norco for pain. (*Id.*) In addition, Dr. Abdulla indicated Plaintiff had a decreased range of motion in her right knee. (*Id.*)

On October 13, 2012, Plaintiff continued to report that she had generalized body pain, which she rated as a "5" out of "10". (Doc. 7-13 at 37) Dr. Abdulla found Plaintiff had a decreased range of motion due to her pain. (*Id.*) A week later, Plaintiff went to the emergency department, reporting "pain and loss of mobility." (*Id.* at 27) Dr. Michael Kirschner found Plaintiff had a normal range of motion, strength, and sensory examination. (*Id.* at 28) Plaintiff was discharged once her pain decreased, and again received educational materials regarding anemia. (*Id.* at 29)

In November 2012, Plaintiff told Dr. Joshi that she had a seizure. (Doc. 7-13 at 67) Plaintiff described her pain as a "4," and said she did not feel weak. (*Id.*) Dr. Joshi recommended that Plaintiff consider a gastric bypass surgery. (*Id.*)

Dr. Joshi completed a "Multiple Impairment Questionnaire" on January 22, 2013. (Doc. 7-13 at 46-53) Dr. Joshi noted she saw Plaintiff every "1-2 months" for treatment of seizures, anemia, and headaches. (*Id.* at 46) According Dr. Joshi, the diagnoses of a seizure disorder and headaches were supported by the MRI of Plaintiff's brain showing a Chiari I malformation. (*Id.* at 47) She observed that Plaintiff's symptoms included seizure-like activity, headache, right-sided "weakness off & on," and migraines. (*Id.*) Dr. Joshi believed Plaintiff could sit, stand or walk up to two hours in an eight-

hour day, and needed to be able to get up and move around each half-hour. (*Id.* at 48) According to Dr. Joshi, Plaintiff could occasionally lift up to 20 pounds, but never more. (*Id.* at 49) In addition, she opined that Plaintiff had moderate limitations with grasping, turning, and twisting objects; using her fingers and hands for fine manipulations; and using her arms for reaching. (*Id.* at 49-50)

In February 2013, Plaintiff told Dr. Joshi that she "had a small [seizure]" two weeks before. (Doc. 7-13 at 66) Plaintiff said she continued to have headaches, and described the pain as "4" out of "10". (*Id.*) She did not have any additional seizures in February, but reported she continued to have headaches in March 2013. (*Id.* at 65)

Plaintiff went to an emergency department on March 10, 2013, reporting she had "[b]ody aches" and "generalized pain," which she had for two days. (Doc. 7-12 at 24, 27) Plaintiff's musculoskeletal and neurological examinations were negative, and she had a full range of motion and normal strength. (*Id.* at 27, 29) Lorelle Perry, NP, observed that Plaintiff appeared "troubled," and was concerned that "when she has this pain[,]it is because she needs a blood transfusion." (*Id.* at 29) She was given information regarding anemia treatment and symptoms, and received a prescription for a multivitamin with iron. (*Id.* at 26, 30)

Dr. Baiju Abdulla completed a "Multiple Impairment Questionnaire" on May 3, 2013, reporting he saw Plaintiff on a monthly basis, and "occasionally more." (Doc. 7-11 at 11-17) Dr. Abdulla noted Plaintiff's diagnoses included anxiety, low back pain, Chiari I malformation, chronic headaches, anemia, and seizures. (*Id.* at 11) He observed that Plaintiff was pale, tired, "timid & anxious." (*Id.*) Dr. Abdulla also noted Plaintiff's range of motion in her lumbar spine had decreased. (*Id.*) According to Dr. Abdulla, the prescription medication was not able to completely relieve Plaintiff's pain without unacceptable side effects. (*Id.* at 12) He opined Plaintiff could sit, stand, and walk "0-1" hour in an eight-hour day, and she needed to be able to move around on an hourly basis. (*Id.* at 13) Dr. Abdulla indicated Plaintiff could lift and carry up to 10 pounds occasionally, and she had limitations with "repetitive reaching, handling, fingering or lifting… due to frequent seizures and headache." (*Id.* at 14) Further, Dr. Abdulla opined Plaintiff had marked limitations with using her fingers/hands for fine manipulations, grasping, turning, and twisting objects. (*Id.* at 14-15)

///

**B.     Administrative Hearing Testimony**

Plaintiff testified at a hearing before the ALJ on November 5, 2013.  (Doc. 7-3 at 35)  She reported she had a tenth-grade education, and did not obtain a GED or take vocational classes.  (*Id.* at 40)  She stated that she worked previously as an apartment manager and in that role was responsible for collecting rent and cleaning outside.  (*Id.* at 43)  She also worked for a short time at Central Valley General Hospital and United Home Care.  (*Id.* at 43-44)

Plaintiff reported she had migraines that turned into seizure-like activity "at least three times a week."  (Doc. 7-3 at 45)  She said that during these episodes, she would "blackout" and have convulsions for "[m]aybe a couple seconds… 30 seconds maybe."  (*Id.* at 52)  She stated that her neurologist also "said that [she] had a few minor strokes."  (*Id.* at 45)  In addition, Plaintiff testified she had "come-and-go pain" in her neck, which could be triggered by how she sat or laid down.  (*Id.* at 46)  Further, she reported she had anemia, for which she took iron.  (*Id.* at 47-48)  Plaintiff said her symptoms included dizziness and being "tired a lot."  (*Id.* at 48)

She reported that on a typical day, she got up at 7:00 a.m. for her son, and would do chores such as washing dishes, mopping the floor, or cleaning the bathroom.  (Doc. 7-3 at 41)  Plaintiff explained that her daughter was up around 10:00 a.m. and would help with the chores because Plaintiff had to take breaks due to "getting dizzy or lightheaded."  (*Id.* at 41-42)  She reported that by noon, she was "resting" by talking to a family member or taking a nap.  (*Id.* at 42)  Plaintiff explained that she took medication late at night, which didn't "kick in till… maybe 2:00 in the morning," so as a result she slept by 2:00pm, then would "wake up, start dinner, [and…] go back to sleep around… 4:00."  (*Id.*)

Plaintiff believed she was able to lift no more than a "10-pound bag of potatoes."  (Doc. 7-3 at 48)  She estimated that she was able to sit "a good 30 minutes" before she needed to stand, and stand for about 45 minutes before she needed to sit.  (*Id.* at 49)  In addition, she thought she could walk "[m]aybe a block" at one time.  (*Id.*)  Plaintiff said her dizziness was worse if she bent over, and if she dropped an item she would "just leave it and call [her] kid."  (*Id.*)

Katie Macy-Powers, a vocational expert ("VE"), testified after Plaintiff at the hearing.  (Doc. 7-

3 at 56) The VE classified Plaintiff's past relevant work as an apartment manager, DOT 186.167-018[2], which was defined as light work. (*Id.* at 57) The VE opined Plaintiff did not obtain any transferable skills while in that position. (*Id.*)

The ALJ asked the VE to consider "a hypothetical person of the same age, education, [and] work background" as Plaintiff. (Doc. 7-3 at 57) In addition, the ALJ indicated "[the] person could lift and carry 50 pounds occasionally, 25 pounds frequently; sit, stand, or walk six to eight hours; and could not climb ladders, ropes or scaffolds, work at heights, or around dangerous machinery." (*Id.*) The VE testified a person with these limitations would be able to perform Plaintiff's past relevant work. (*Id.*) The VE also opined such a person could perform other work such as kitchen helper, DOT 318.687-010; linen room attendant, DOT 222.387-030; and hospital cleaner, DOT 323.687-010. (*Id.* at 57-5)

Next, the ALJ limited the hypothetical individual to light work—which included the ability to lift and carry 20 pounds occasionally and 10 pounds frequently—as well as "sit, stand, or walk six to eight [hours]; and the same seizure precautions." (Doc. 7-3 at 58) The VE testified the individual could perform Plaintiff's past relevant work, as well as other light work. (*Id.* at 58-59) For examples, the VE identified positions as a fast food worker, DOT 311.472-010; cashier, DOT 211.462-010; and sales attendant, DOT 299.677-010. (*Id.* at 59)

Third, the ALJ asked the VE to consider an individual who was limited to sedentary work, including lifting and carrying 10 pounds occasionally or frequently, standing or walking two hours in an eight-hour day; and sitting "six to eight [hours]." (Doc. 7-3 at 59) The person also would also require seizure precautions. (*Id.*) The VE testified that such a person could not perform Plaintiff's past relevant work. (*Id.*) However, the VE believed the person could perform other work, such as an order clerk, DOT 209.567-014; touch-up screener, DOT 762.684-110; and decorative painter, DOT 735.687-018. (*Id.* at 59-60)

Plaintiff's counsel asked the VE to consider an individual "who would need to take two unscheduled 15-minute breaks during a work day outside of normal breaks, as well as a lunch break."

---

[2] The *Dictionary of Occupational Titles* ("DOT") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

(Doc. 7-3 at 61)  The VE opined such a person would not be able to work in the national economy. (*Id.*)  Likewise, the VE opined a person would be unable to work if she "would be off task up to one-third of the day." (*Id.*)

Counsel also asked the VE to "assum[e] a person of the same age, education, and past work experience as the claimant who… would need to get up and move around every hour for 15 minutes." (Doc. 7-3 at 62)  The VE testified such a person would be able to do Plaintiff's past relevant work. (*Id.*)  According to the VE, the addition of manipulative limitations "for grasping, turning, and twisting objects…up to two-thirds of the day" did not affect the ability to do Plaintiff's past work.  (*Id.* at 62-63)

Finally, if the person was "likely to miss about four days a month," the VE opined there would not be any work available, because no employer would allow the four missed days.  (Doc. 7-3 at 60-61)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the application date of December 22, 2011.  (Doc. 7-3 at 21)  At step two, the ALJ found Plaintiff's severe impairments included: "morbid obesity, a seizure disorder, Chiari I malformation, cervical degenerative joint disease, right knee degenerative joint disease, and iron deficiency anemia."  (*Id.*)  At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or equaled a Listing.  (*Id.* at 21-22)  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, and sit, stand and/or walk 6-8 hours in an 8-hour work day, but she can never climb ladders, ropes, and scaffolds, and she must avoid heights and dangerous machinery.

(*Id.* at 22)  Based upon this RFC, the ALJ concluded Plaintiff was "capable of performing past relevant work as an Apartment Manager." (*Id.* at 26)  In addition, the ALJ determined Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 27)  Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act.  (*Id.*)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred in her evaluation of the medical record and the limitations articulated by Drs. Joshi and Abdulla, as well as her nurse practitioner Aytman.  (Doc. 8 at 14-20)

According to Plaintiff, the ALJ failed to articulate specific and legitimate reasons for rejecting the opinions of her treating physicians. (*Id.* at 15, emphasis omitted) Therefore, Plaintiff contends that "the doctors' assessments were erroneously unincorporated into the determination of [her] residual functional capacity." (*Id.* at 18)

### A. Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Addressing the opinions of Plaintiff's treating physicians and Ms. Aytman, the ALJ explained the weight given as follows:

> I also give little weight to the opinions [of] nurse practitioner Aytman and Dr. Joshi and Dr. Abdulla that the claimant is limited to a sedentary range of work based upon the minimal objective findings in the medical evidence of record, as discussed above (e.g., essentially normal CT scans and MRI's (sic) of the claimant's brain, minimal findings

> on MRI of the claimant's lumbar spine, few objective findings on physical and/or neurologic examinations other than some right knee swelling and crepitus). Furthermore, Ms. Aytman is not an acceptable medical source (SSR 05-03p). A sedentary residual functional capacity is too extreme given the paucity of objective findings on examinations and diagnostic studies. I do… give great weight to treating physician Dr. Joshi's opinion that the claimant can lift up to 20 pounds, as this limitation is supported by the positive MRI findings of the claimant's cervical spine, above.

(Doc. 7-3 at 24)

Significantly, the Ninth Circuit determined an ALJ may give less weight to the opinion of a physician when an ALJ finds inconsistencies with the physician's records, *and* the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Similarly, inconsistency with the overall record constitutes a legitimate reason for discounting a physician's opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999). However, to reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

Although the ALJ purported to identify evidence that is inconsistent with the findings of nurse Aytman and Drs. Joshi and Abdulla, the ALJ did not meet the burden of explaining why she believed the evidence was inconsistent with their opinions. Moreover, though the ALJ characterized the CT scans and MRIs as "essentially normal" in discussing the weight given, as noted by the ALJ elsewhere in her opinion, the medical record shows that imaging of Plaintiff's brain showed a Chiari I malformation and is not, by definition, "essentially normal." (*See* Doc. 7-3 at 23, citing Exh. 2F, p.5; 4F pp. 22-23; 5F, p. 41; 7F, pp. 15-16; and 17F, p. 19) In addition, the ALJ fails to address instances where Plaintiff did not have "normal" neurological examinations. (*See, e.g.*, Doc. 7-8 at 19, 46; Doc. 7-10 at 117)

Further, each of the opinions rejected by the ALJ included manipulative limitations, such as grasping, turning, twisting, and fine manipulation. (*See* Doc. 7-3 at 24) Ms. Aytman[3] noted in her

---

[3] A nurse practitioner working under the supervision of a doctor is an acceptable medical source. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011). Moreover, a nurse practitioner is a proper medical source when

13

evaluation that Plaintiff was diagnosed with arthritis (Doc. 7-1 at 105), and Dr. Abdulla indicated the manipulative restrictions were necessary "due to frequent seizures and headache." (Doc. 7-11 at 14) Likewise, Dr. Eisner, who treated Plaintiff in the emergency department, found Plaintiff had "arm heaviness/weakness" related to her migraines. (Doc. 7-10 at 77) The ALJ did not identify any evidence undermining the manipulative limitations identified by each of the individuals who treated Plaintiff, yet did not adopt them in the residual functional capacity.

Because the ALJ failed to identify and explain inconsistencies between the medical record and the conclusions offered by Drs. Joshi and Abdulla, the ALJ fails to meet her to resolve the conflict. *See* Allen, 749 F.2d at 579; *Embrey*, 849 F.2d at 421. Thus, the purported inconsistencies do not support the decision to give less weight to the opinions of the physicians. Further, the ALJ fails to address the manipulative limitations imposed by Plaintiff's treating physicians and the nurse practitioner. Consequently, the ALJ erred in evaluating the medical evidence and determining Plaintiff's residual functional capacity.

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

---

evaluating "the severity of [the plaintiff's] impairment(s) and how it affects your ability to work." 20 C.F.R. § 404.1513. However, the Court does not now decide whether Ms. Aytman is an acceptable medical source.

In this case, the ALJ failed to identify specific and legitimate reasons for giving rejecting the opinion of Drs. Joshi and Abdulla related to Plaintiff's physical impairments, including the manipulative limitations imposed. As a result, the residual functional capacity lacks the support of substantial evidence. Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence to determine Plaintiff's physical residual functional capacity. *See Moisa* , 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in assessing the opinions of Plaintiff's treating physicians, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on this matter, no findings are offered on the remaining issue in Plaintiff's opening brief.

Accordingly, the Court **ORDERS**:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Lavonne Harris and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 2, 2017**              /s/ Jennifer L. Thurston
                                    UNITED STATES MAGISTRATE JUDGE